OPINION OF THE COURT
Robert F. Julian, J.
Relief Requested:
(1) Approval of an outpatient treatment plan pursuant to Kendra’s Law which petitioner, during the hearing thereon, moved to withdraw; (2) a determination that the court may not refer the respondent to the District Attorney regarding facially criminal conduct prior to and during institutionalization; and (3) granting anonymity and a sealing of the record.
Holding:
*448 (1) Petitioner’s motion to withdraw the petition is denied. (2) The assisted outpatient treatment plan proposed in the petition is approved and its implementation is ordered. (3) There was a failure to treat a serious aspect of Mr. H.’s diagnosis during the inpatient stay, and a failure to provide for this diagnosis in the proposed outpatient treatment plan. The court, despite its opinion that the discharge is totally inappropriate, is powerless to reverse the decision to discharge Mr. H. or modify the treatment plan. The court urges an amendment to section 9.47 of the Mental Hygiene Law to allow the Director of Community Services to challenge the discharge of patients where in the Director’s opinion the discharge is arbitrary, capricious, and an abuse of discretion. (4) The transcript and exhibits are referred to the District Attorney for investigation of Mr. H.’s facially criminal conduct. The court is empowered to make such a reference under the Mental Hygiene Law in the interest of justice and because the District Attorney is an interested party. (5) The record is otherwise sealed pursuant to the Mental Hygiene Law. The patient is granted anonymity and is to be referred to as Barry H.
Discussion:
Barry H. is a man who has had numerous psychiatric hospitalizations and multiple contacts with the criminal justice authorities. A psychological assessment updated to June 15, 2001 by John S. Wilson, PhD, and included in Mr. H.’s records in evidence, includes four single-spaced pages reciting Mr. H.’s institutional history starting in 1974. Mr. H. has a record of many psychiatric interventions, hospitalizations, and criminal arrests.
As will be discussed in this opinion, Mr. H. carries a disputed diagnosis of schizophrenia and an undisputed diagnosis of antisocial personality disorder. He also carries several diagnoses pertaining to sexual perversion, including fetishism, frotteurism and paraphilia.
He has a long-standing record of violent assault; inappropriate touching; exposing himself to children; and preoccupation with sex, including sex with children. His first arrest for public lewdness was in 1981, although there is also suggestion in the record that he was arrested twice for indecent exposure in 1980.
An application was made by the Oneida County Commissioner of Mental Health for an order pursuant to Mental Hygiene Law § 9.60 et seq. (Kendra’s Law) and Mental Hygiene Law § 9.47 (b) directing an assisted outpatient treatment plan *449 for Mr. H. This application was based upon a determination by the New York State Department of Mental Hygiene to discharge Mr. H. from the Mohawk Valley Psychiatric Center. Mr. H. had been admitted to the Psychiatric Center involuntarily on April 15, 2001 based upon an incident that is described in the medical records as Mr. H. having exposed his penis to children. Apparently no criminal charges were brought against him for this act. His most recent previous release from confinement had been on April 9, 2001.
Throughout the records of this hospitalization are specific reports that Mr. H. engaged in activity toward other patients and staff that was facially criminal and likely in violation of the Penal Law.[1] The most repugnant of these incidents were: exposing his penis to another patient; inappropriately touching other male and female patients with sexual intent; engaging in assaultive behavior toward other patients; and dropping his pants and exposing himself to other patients and staff. At no time were any of these facially criminal behaviors reported to the criminal justice authorities. Based upon Mr. H.’s diagnosis and the opinion of his physicians at the Psychiatric Center, the court concluded that the event precipitating Mr. H.’s hospitalization and his actions while hospitalized which suggest criminal conduct must be reported to the District Attorney for proper consideration and so advised counsel at the end of this hearing. A copy of this opinion will forthwith be referred to the District Attorney with the request that he review both the opinion, the transcript of this proceeding, and/or the hospital chart, which is in evidence. Mr. H.’s motion asserting that the court is not empowered to make said referrals is denied. The reasons for the denial are set forth below.
The proposed outpatient treatment plan presented to the court provides for Mr. H. living independently in a rooming house. He would have supervision during the day, but not during the evening. This would be accompanied by a regime of medication and supervised benevolent employment.
Unfortunately, as will be discussed at length below, this treatment plan only addresses Mr. H.’s schizophrenia. His treating physician, Dr. Fogelman, a board-certified psychiatrist employed by the State, testified that Mr. H. carries two diagnoses: an Axis I diagnosis of schizophrenia and an Axis II *450 diagnosis of antisocial personality disorder.[2] Dr. Fogelman opined that Mr. H. was likely to be rehospitalized in the future as it pertains to the Axis I diagnosis, even with the proposed discharge plan. He was of the opinion that the schizophrenia was sufficiently controlled to allow for discharge, but he was concerned that Mr. H. would be a risk to himself and others after discharge when the inevitable decompensation of his schizophrenia occurs. Dr. Fogelman testified that the proposed outpatient treatment plan was exclusively directed toward the Axis I diagnosis and that the Axis II diagnosis was not addressed at all.
The Axis II diagnosis of antisocial personality disorder is a transcendent problem for this court specifically because it was not treated during this hospitalization and treatment for it is not part of the proposed outpatient treatment plan. Antisocial personality disorder was the Axis I diagnosis in the opinion of the staff psychologist, Dr. John S. Wilson, who did not testify but, as noted above, his detailed report is in evidence.[3] Dr. Wilson and Dr. Fogelman opined that Mr. H.’s behaviors might improve with therapy, but Dr. Fogelman testified that the condition underlying the behaviors (antisocial personality disorder) was untreated throughout the hospitalization due to an inability to obtain the appropriate group therapy programs. Dr. Fogelman testified that it was his opinion that Mr. H. posed a risk to others by virtue of this untreated condition, while contemporaneously acknowledging that the condition is totally unaddressed in the proposed assisted outpatient treatment plan.
Dr. Fogelman further defined for the court the diagnosis of antisocial personality disorder: “I would call that his personal *451 ity, the type of person he is. I view that these behaviors are fairly unchangeable without significant treatment and that the responsibility for keeping the community safe really falls upon the correctional system. If he breaks a law, then he should be charged and sent to the appropriate correctional facility.” (Emphasis added.) Mr. H.’s behavior throughout his hospitalization was that of a dangerous, sexually obsessed predator who, despite close observation, engaged in outrageous and facially criminal conduct against his fellow patients. Mr. H. engaged in these activities despite the hospital having placed him on an exceptional level of observation. Indeed, given Dr. Fogelman’s view that his behavior was a function of his personality rather than his schizophrenia, why he was not reported to the police and arrested for his conduct within the institution is the first mystery. Why Mr. H. did not receive significant treatment for his antisocial personality disorder is the second mystery.
The court is chilled and concerned that the psychologist who examined Mr. H. at the State Hospital, the above-referenced Dr. Wilson, thought Mr. H. was malingering and not schizophrenic, and felt he was dangerous to others, including children, secondary to his antisocial personality disorder. While Mr. H.’s psychiatrist, Dr. Fogelman, disagreed with the malingering diagnosis, he clearly agreed with Dr. Wilson that Mr. H. poses a continual future risk of engaging in sexually aggressive behavior with vulnerable and young patients and possibly with children as well. Dr. Fogelman opined that Mr. H. would likely engage in inappropriate touching after discharge and that the criminal justice system was better equipped to deal with Mr. H., because his sexual misconduct was attributable to his antisocial personality disorder and not his schizophrenia.
Apparently appalled by the totality of the record following the court’s extensive questioning, the petitioner, intra-hearing, moved to withdraw its petition. Mr. H. joined in petitioner’s motion seeking discharge without any mandated treatment plan. Mr. H. told the court he was unwilling to comply long term with any outpatient treatment plan or order of the court, and made it clear that he felt he did not need outpatient supervision. Also, during the hearing, in an about face, Dr. Fogelman testified that the institution would be more likely to review the wisdom of Mr. H.’s discharge if the petition were withdrawn. He expressed his sense that the decision to discharge Mr. H. would be carefully reviewed if the petition were *452 withdrawn. The only reason for the apparent change of heart by the petitioner and Dr. Fogelman was the court’s on-the-record review of Mr. H.’s records and the questions raised by the court about the absence of both inpatient treatment and an outpatient treatment plan for the Axis II diagnosis.
Petitioner’s motion to withdraw the petition was and is denied for the following reasons: The court is mindful of the constraints posed by the statute establishing and governing assisted outpatient treatment (AOT) plans, Mental Hygiene Law § 9.60 et seq. The court is well aware of the recent (July 26, 2001) Appellate Division, First Department, decision Matter of Manhattan Psychiatric Ctr. (Anonymous) (285 AD2d 189), in which that Court construed the statute and determined that the only issue properly before a court is whether or not to order an AOT. The merits of the plan itself, or the appropriateness of releasing the patient, are not before the court. Mr. H., who opposes the plan, has stated on the record that he intends to seek release by habeas corpus based upon the institutional opinion that he is ready for discharge.
The court is powerless to prevent the occurrence of what is an obvious abuse of discretion by the institution in deciding to discharge this man. The Psychiatric Center and Mr. H.’s physicians have, by their own admission, not treated Mr. H. for his Axis II diagnosis of antisocial personality disorder, acknowledge that he engaged in outrageous and facially illegal activity throughout the hospitalization that was unreported to the authorities, and opine that he poses an immediate danger to others. Their “excuse” for these failures is that the criminal authorities are better equipped to give Mr. H. therapy in jail. Thus, untreated and dangerous, the Psychiatric Center and the physicians would discharge Mr. H. with a treatment plan that only addresses his Axis I diagnosis, place him unsupervised in a rooming house that Mr. H. selected which the Psychiatric Center opines is away from children and others who are vulnerable, and leave him unsupervised for many hours every day. The Psychiatric Center’s position is at best scattered and incoherent and, at worst, cynical, uncaring, and apparently well below the standards of accepted medical practice. The court cannot help but be concerned about possible liability on the part of the State should Mr. H. act consistently with its own psychiatrist’s assessment and, upon release, commit some act of sexual predation, perhaps against a child.
It is impossible to believe that a scenario as negligent and absurd as this one could have been contemplated by the well- *453 intentioned drafters of Kendra’s Law, which was, after all, intended to prevent assaults against the public by having outpatient treatment plans that are court ordered. Dr. Wilson, the State employed psychologist, concludes in the medical record that Mr. H. most probably will commit criminal acts upon release and hopes he will be taken into custody by the criminal justice system, since he can actually be treated within its confines. The idea behind Kendra’s Law was to prevent the next Kendra’s case. Here the institution fully expects and all but intends the next case, so that Mr. H. can then be jailed and treated. This man should not be released simply so that he can perpetrate a crime and be incarcerated — he has already engaged in criminal activity sufficient to be charged and he has not received any psychotherapy to reduce the risk of the commission of a new crime. In brief, it is the court’s opinion that there are more than sufficient reasons to keep this man away from the public. Courts should be empowered to protect the public against florid, flagrant and unrefuted negligence in a proposed patient release, as in the case at bar. There must be an institutional check and balance to prevent obvious abuses of discretion such as has occurred here.
The petitioner’s request to withdraw the petition was and is denied because the court can take no succor in the Psychiatric Center’s representations that it will review its decision to release Mr. H. more carefully if the court grants the withdrawal. There can be no question based on the competent evidence that this man is untreated for his Axis II diagnosis, that he poses a major risk to others, and requires further therapy and treatment. Mr. H. should not have been a candidate for discharge and he should not be discharged. He certainly requires inpatient therapy to treat his Axis II diagnosis, as well as an outpatient plan addressing the same, but sadly no such recommendation is before the court. Although Mental Hygiene Law § 9.60 (i) authorizes the court to require a written outpatient treatment plan, it does not appear from the statute, and certainly does not appear from the one Appellate Division ruling applying the statute, Matter of Manhattan Psychiatric Ctr. (supra), that the court can scrutinize the plan and require improvements in it. Thus the court must either accept or reject this plan. Of course, the court would be more than pleased to entertain any further and more comprehensive plan that the petitioner might offer regarding the Axis II diagnosis. The proposed treatment of Mr. H.’s Axis I diagnosis is the least restrictive treatment appropriate and feasible for the patient’s *454 Axis I diagnosis and the court has signed the proposed order based on those findings. As an outpatient, Mr. H. clearly is at substantial risk to decompensate from his schizophrenia without the proposed treatment plan. The petitioner has met its statutory burden. The medication and limited supervision provided in his plan will assist in stabilizing the apparent schizophrenia.[4] The court faces a Hobson’s choice and elects to order the outpatient treatment plan because his Axis I diagnosis mandates it. Based on the Psychiatric Center’s serial failures in this case, the court will not gamble that they will correct their clear abuse of discretion in this matter and reverse their decision to discharge this man. Society and this patient are better served by this woefully inadequate outpatient treatment plan than by no treatment plan, and thus, the motion withdrawing this application is denied and the order granted.
Because of Supreme Court’s total lack of recourse despite clear failures, such as in this case, it is hoped that the Governor and the Legislature will explore the gaps in the Mental Hygiene Law that fail to provide recourse in cases where the institution has clearly abused its discretion and is admittedly releasing an untreated, dangerous person with a plan that fails to address the untreated condition. The court applauds the efforts of the Governor and Legislature to fashion a statute such as Kendra’s Law that increases protection to the general public while respecting the patient’s rights. It is unfortunate that the Director of Community Services (Director) did not seek CPLR article 78 relief regarding this discharge. In a case such as this, however, where an entire element of the patient’s diagnosis is not addressed in the treatment plan, and where it is acknowledged that this diagnosis was untreated during the hospitalization, the court should be given latitude to raise questions about the discharge and the plan by requesting that an independent examination occur prior to discharge. The court recognizes that the role of the Director of Community Services is ambiguous. Whether or not the Director has standing to contest a specific discharge is unclear. The Director does have a statutory duty pursuant to section 9.47 (a) of the Mental Hygiene Law to see that all “mentally ill persons within their respective communities who are in need of care and treatment *455 at a hospital are admitted to a hospital pursuant to this section.” A broadening of the local Director’s powers to allow him/her to question an inappropriate discharge by article 78 proceeding, or when asked to review a discharge by the court, utilizing the very narrow and exacting “arbitrary, capricious, and abuse of discretion” standard to review a discharge, would provide sorely needed recourse and would clarify the rights and duties of Directors of Community Services in circumstances like the case at bar.
The court’s intention to refer this matter to the District Attorney is opposed by a further motion by Mr. H. for the following relief:
1. That the court reconsider and not refer this matter to the District Attorney because the same would be a breach of section 33.13 (c) (9) (vi) of the Mental Hygiene Law;
2. Sealing of the patient’s record pursuant to the Mental Hygiene Law and the CPLR;
3. Amending the original caption to name the respondent as Barry H. to give the respondent anonymity.
 With regard to the first request, this matter is properly referred to the District Attorney. The respondent argues that section 33.13 (c) (9) (vi) of the Mental Hygiene Law constrains the court’s ability to refer patient’s records to a District Attorney because the statute requires the permission of a Commissioner of Mental Hygiene or a local Mental Health Commissioner as a condition precedent. Recognizing that this issue appears to be one of first impression, the court disagrees with respondent and believes the statutory law is clear and unambiguous and grants courts of record broad powers to disclose both medical records and court transcripts where the interests of justice outweigh the need for confidentiality. Section 33.13 (c) (1) states with regard to the court’s prerogatives regarding release of a patient’s hospital record, inter alia:
“Such information about patients or clients reported to the offices, including the identification of patients or clients, and clinical information tending to identify patients or clients, at office facilities shall not be a public record and shall not be released by the offices or its facilities to any person or agency outside of the offices except as follows:
“1. Pursuant to an order of a court of record requiring disclosure upon a finding by the court that the interests of justice significantly outweigh the need for confidentiality.”
*456 The statute grants to the court the prerogative to disclose a patient’s records to the District Attorney when the interests of justice so dictate and outweigh confidentiality issues. Mr. H.’s behavior and the danger he poses clearly and significantly outweigh any right and/or privilege he has.
Turning to whether or not the court can properly refer the transcript of this proceeding to the District Attorney, Mental Hygiene Law § 9.31 (f) empowers the court to release the transcript of an article 9 proceeding to any individual or entity that a court of record finds to be “properly interested.” The behavior of Mr. H. prior to his admission and during his admission to the Psychiatric Center by itself defines the District Attorney as a “properly interested” party in this proceeding and necessitates the referral of both the hospital record and the transcript. Mr. H.’s apparent criminal conduct immediately prior to a 2000 hospitalization (i.e., exposing himself to children in a school yard), and his facially criminal conduct when institutionalized (i.e., exposing himself, molesting, etc.), coupled with the opinions of his physicians that he should be prosecuted for his criminal activity, create an obvious community interest in seeing his crimes reported, investigated, and acted upon. The institution did not report Mr. H.’s activity to the District Attorney. However, the court finds that, if the allegations are true, Mr. H. poses a significant risk upon discharge to the public and particularly to children. This is the very definition of the interests of justice and makes the District Attorney an interested party. Thus, the court reports Mr. H.’s activities to the District Attorney based on the cited statutory authority.
Regarding the application for anonymity and sealing, the court is mindful of the importance of the physician-patient protections accorded patients under Mental Hygiene Law § 33.13 and CPLR 4504. CPLR 4504 obligates the health care provider to keep confidential medical records and/or communications between health care providers and patients. This statute along with Mental Hygiene Law § 33.13 places significant limitations on the State Department of Mental Hygiene regarding the release of patient records. The proceeding in the case at bar is further sealed pursuant to section 9.31 (f) of the Mental Hygiene Law, which provides that any proceeding, such as the case at bar, which is commenced under article 9 of the Mental Hygiene Law “shall be sealed and shall be exhibited only to the parties to the proceeding or someone properly interested, upon order of the court.”
*457 Certainly the interests of justice, society, and the public safety significantly outweigh this man’s privacy interests with regard to the referral to the District Attorney. At the same time, the law does accord him privacy with regard to society at large.
Holding:
The court grants petitioner’s application for a supervised outpatient treatment plan pursuant to Kendra’s Law. The court seals Mr. H.’s record pursuant to section 9.31 (f) of the Mental Hygiene Law, grants anonymity, and refers his case, including the court’s decision and the transcript of this proceeding, to the District Attorney. Moreover, the court does refer this opinion to both JCAH and the State Health Department for further investigation. The court urges an amendment to section 9.47 of the Mental Health Law to allow the Director of Community Services to challenge the discharge of patients, where in the Director’s opinion, the discharge is arbitrary, capricious and an abuse of discretion.

. E.g.: Apr. 23, 2001, exposed himself to clients and staff; Apr. 25, 2001 “torments” other more vulnerable consumers; May 2, 2001, involved in altercation, admits “hitting” another consumer; June 2, 2001 “inappropriate touching” of female peer.

. “The American Psychiatric Association introduced a new diagnosis and statistical manual of Mental Disorders (DSMI) in 1952. The 3rd Edition (DSMIII) was published in 1980 and revised as DSMR in 1987. This classification attempts to rely entirely on descriptions of symptoms and signs, i.e. what the patient says and does as indicators of how he thinks and feels. Specific diagnostic criteria (based on current clinical impressions and not yet fully validated) are suggested for the various disorders. DSMIII also inaugurates a five Axis evaluation system for coding information. The first three Axes constitute the diagnosis assessment. Axis I codes the clinical syndrome and some additional codes; Axis II diagnoses personality disorders and specific developmental disorders; and Axis III potentially relevant physical disorders. Axis IV codes the severity of psycho-social stressors. Axis V, the highest level, of functioning during the past year.” (Merk Manual at 1535 [16th ed].)

. The hospital record resolves this disagreement between Dr. Wilson and Dr. Fogelman by stating the Axis I diagnosis as schizophrenia and the Axis II diagnosis as antisocial personality disorder.

. The court reiterates that there is a dispute between Mr. H.’s psychiatrist and his psychologist in the hospital record that Mr. H. is in fact a schizophrenic, but accepts the schizophrenia diagnosis for the purpose of evaluating the Mental Hygiene Law § 9.60 application.